Case number 16-1443. Lucia Gason v. Dow Corning Corporation. Oral argument not to exceed 15 minutes per side. Ms. Beth Rivers for the appellant. Good morning, your honors. I'm going to reserve four minutes for review. As clerk said, I'm Beth Rivers. I'm here on behalf of the plaintiff appellant. This is a case that involves failed promises made to a long-term valued employee of Dow Corning. And despite her dedication, loyalty, and reliance on her employer's words and deeds, in reliance on which she gave up valuable employment benefits and agreed to permanently relocate to the United States, Dow Corning failed to follow through on those promises, resulting in financial losses. Are you traveling on an express promises theory or an implied promises theory? Express. What was that promise? The promise was to, as part of the local, the promise was to localize her, which by definition required the company to pursue a green card on her behalf. They didn't promise her a green card, did they? Well, you know, I didn't mean to interrupt, your honor. Clearly, it's up to the government as to whether to issue a green card or not. And we're not arguing that Dow Corning could control the government's actions. What I think the trial court missed in that regard is what it means to localize. And I think all the parties, both the managers on Dow Corning's side and the plaintiff, understood, which maybe the trial court didn't, is that by definition localization requires a green card. She could not stay in the position. She could not obtain permanent residency. She could not localize without the green card, which the application, although not the obtaining of the green card, but the application and processing and sponsoring of that application was under the control of Dow Corning. So are you stitching that express promise from things other than or in addition to the localization issue? And if so, where else does it come from? You know, because I know you say that you can't localize unless you get the green card. But you've also said there was an express promise. And it seems to me that just the localization issue itself doesn't get you to the express promise. Well, where I get that from is not my understanding of it, but Dow's relocation experts' understanding of it. And if you look at their testimony, what they testified to was that, by definition, localization requires a green card and it requires permanent residency. And that's where the express promise comes from. If you say we're going to localize you, it means we're going to get you a green card. Okay. And you admit, though, that Dow couldn't control the government's actions. Right. And so Dow, in the papers, it suggests that Dow said we'll use our best efforts, or there was an indication that they would use their best efforts and forget that. Where did that best efforts promise, if you will, break down prior to her termination? And just to clarify, she was never terminated. She was just forced to go back to Belgium. Where did it break? It broke down right from the start, and I think this is the other error that the trial court made in looking at the factual background of the situation. The relocation expert immediately notified the immigration attorney in February that she was to be localized and they should start getting the green card. And the immigration attorney sent the paperwork back to Dow to start the process, and the first step in that process was for the employer to do the job description. Nothing could happen until the employer completed the job description, and nobody disputes that. Is that where you say that they violated their promise, was not pushing the job description, or kind of exactly where did they go wrong in your view? Well, I don't think there's one single spot where they went wrong. I think what went wrong is they delayed and delayed and delayed and didn't do what they were required to do to process the application to the point where it became impossible for them to get it done. There were long delays, though, by your client. When they sent your client information, there were long periods of time where your client didn't respond. Again, the trial court ignored the testimony, and the exhibits in the record would show her efforts to try and get them the information, her asking them for information. She wasn't an HR expert. The information was within the control of Dow Corning. She asked for their assistance in getting the information. And her part of that process comes after the job description is done. And the job description, as far as we know, wasn't even done as of November of 2013. She was localized in February of 2012. Dow did a reorganization during the midst of all this, right, and her job changed from what it was originally going to be, did it not? It did. So she was localized under a position as of February of 2012. She began that position in April, and as I started to say before, they got the paperwork that they needed to complete the questionnaire from the immigration attorneys in February. They didn't even distribute that to the Dow managers to start working on it until August. There's no explanation for why they waited that long. And nothing is done, and then in February, she gets a new position. And because the process hadn't been started, we now have to start all over and work on the new job. You referred earlier to Dow's relocation expert. Which one is that? There's two of them, Butler and Ratajk. Okay. Now, I gather you concede, though, that your client was an at-will employee, right? Absolutely. And we've never argued anything different. We don't believe that getting a green card meant that she could never be terminated or that there was some transferred into just-cause employment. We've never argued that. I don't think that that matters. We're not saying that they couldn't terminate her for poor performance. What we're saying is they couldn't create a pretext of poor performance to justify their failure to do what they promised to do. Are you alleging that poor performance was a pretext? Absolutely. And let me explain. How does that connect to at-will? Because if you're arguing pretext, you're sort of arguing some type of cause, aren't you? I'm arguing no. Because they say they're doing it for X reason. And if she's at-will, they can do it for any reason. They could. But I think an inference that you can draw from when you make up an excuse that's not true to justify your actions, then you can challenge the legitimacy of the decisions they made. What's your best case for that? I would go to the employment discrimination cases on pretext, even though that's not what we're arguing in this case. I don't think there's any case in the breach of contract context that I know of. Because you're not alleging gender discrimination or age discrimination. No, we're not. No, we're not. They ended up demoting her, in a sense, and sending her back to Belgium, right? They did. Is that where she's currently employed? She is. By Dow Corning. She is. She's still employed. But back to the pretext argument. I don't know if you want further explanation. She got a great review in 2012. She got a great review for 2013, which was issued in February of 2014. If you look at, I believe it's Exhibit 24 to our response to motion for summary judgment, there's e-mails from her team praising her performance as of May of 2014. When did things go south? Well, I don't know that they ever did. The negative review was a mid-year review, and that occurs after May of 2014 and after a recognition by their managers that they can't get the green card processed in time. Just going back to the statement here, usually we say, in the employment discrimination, race, gender, we usually say an at-will employee can be fired for any reason but not for a discriminatory reason. And I guess coming back to the question, in this type of circumstance, where you're not alleging any of those, is there any case that you know of that addresses that conflict, you might say, between at-will employment and what reason you can give for it? No. And, Your Honor, let me clarify. We're not suggesting that if she truly was a poor performer, they didn't have every right in the world to demote her or terminate her. I guess what I'm saying is that the trial court is required to look at all reasonable inferences in the light most favorable to the plaintiff. And I think one of those inferences- when the dispute isn't about whether her performance was a characteristic because it's at-will employment, that's where the puzzle is. Well, I think that that would be an issue that would be tried. I don't know that- But, again, the whole point of at-will employment is that you don't get to litigate it. No, I don't think- let me clarify. I mean, because, you know, I don't think that you're litigating it by saying that it creates a reasonable inference that something else was going on in their mind. You know, we're not saying that she was a just cause employee and that she could never be terminated. We're not going to litigate that issue. That's not the issue that was before the court. A reasonable inference as to what? Whether they're violating a contract? Whether they used performance as an excuse to justify their actions when, in fact, their action- the move to Belgium was caused not by poor performance but by their failure to complete the requirements to localize her. Judge Gilman, did you have a further question? Don't you still, though, have an issue with this- I mean, the breach of contract part of it, though. On the Dow's efforts to pursue the green card, because there's no dispute that Dow took some efforts toward that, correct? Right. Okay. But I think that their efforts were meaningless in the light of what they had to do. We couldn't even get the process started until they got their job description, and it took two years to get a job description drafted for an employee when they have an entire HR department who does job descriptions, and, in fact, the plaintiff testified that Lee Stokes had prepared a job description for the new position. Okay. Thank you, Counsel. You'll have your time for rebuttal. Thank you. Good morning, Your Honors. My name is Bill Fallon. I represent the Eppley Defendant Dow Corning Corporation in this case. I do believe that the facts and the law have been thoroughly articulated in the brief, so I just want to talk about three points, really in the interest of stepping back from the trees and taking a couple looks at perspectives on the forest. First point, words matter. The plaintiff's criticized the arguments we have made, characterizing our positions as parsing words when we compare the translations of the alleged agreement that she's offered in her briefs with the agreement she alleged in her complaint, which was explicitly four times to obtain a green card for Dow Corning. Now, in subsequent arguments, she has now identified, in her lawyer's words, by my count seven different interpretations of that alleged agreement. And just to illustrate that, in her reply brief, which, of course, we didn't have a chance to reply to, there were two new alleged promises. Those were the promise to process her application for a green card, and then next, a promise, an alleged promise of a position in the United States, which required her to localize, which in turn required Defendant to sponsor her. We previously had allegations that the promise alleged as one to obtain became a promise to sponsor, became a promise to use best efforts, became a promise to pursue, a promise to pursue and attempt to obtain, or a promise to take the necessary steps to obtain. Those are all quotes from the briefs that she's filed. But those words do not all mean the same thing without question. To obtain certainly is distinct from to use best efforts or to process the application or to sponsor her. So if the plaintiff herself can't even resolve what specific contractual promise or misrepresentation she's alleging, how could it be that she could satisfy the quite rigorous test that Michigan law has established for any of these three claims, fraud, promissory estoppel, or breach of contract? Your Honors, I'm sure know these terms, but for a fraud claim, it must be pleaded with particularity. The evidence must be clear, unequivocal, and cogent. And the plaintiff must plead the time, place, and content of the alleged misrepresentation. The promissory estoppel cases are replete with similar comments. A promissory estoppel claim must be based on a promise that is actual, definite, and clear. The Michigan courts say, and this court has applied these very same principles and terms, promissory estoppel must be used cautiously only when the facts are unquestionable. And the courts have emphasized that no subjective interpretations are sufficient to establish a promise. All right, but Dow Corning did agree to localize her, right? Because if she was going to have a permanent job here, they had to pursue localization, and that required Dow Corning to pursue a green card for her, right? At the very least. You don't dispute that, do you? Okay, what happened? Dow Corning agreed to localize. I want to emphasize one thing. Localization is the matter of coming off an expatriate arrangement where terms and benefits compensation and such are determined under her Belgian employment arrangement with a Dow Corning Belgian subsidiary. Localization is the process of converting to Dow Corning U.S. terms of employment. Now, there's nothing in the localization itself that requires a green card. What requires a green card is to perform work in this country indefinitely without any other kind of work visa. All right, but if Dow Corning U.S. had agreed to have her position shift permanently to over here, they were going to have to get her a green card eventually. We were going to have to try to get her a green card, which is— Now, she claims, though, that you didn't try hard enough. But, Your Honor, first of all, the try hard enough allegation has never been pled in this case. The allegation was to obtain. Second, under Michigan law, the best efforts requirement is a specific legal theory. Judge Ludington noted that that legal theory nor its premises were not pled. A best efforts obligation under Michigan law arises, for example, when I make you my exclusive sales representative in a certain area and I don't receive any other consideration in exchange for agreeing with you to that. Well, you then have an implied best efforts obligation because if you don't go out and try hard, I don't get any other consideration. That doesn't apply here. It's clear Ms. Gasone got lots of consideration. She got all the benefits, compensation that were associated with her employment. There's no question that the process is, when a person localizes, it will be necessary for Dow Corning to begin the process to sponsor that person for a green card. That is not a contractual obligation. We all follow lots of processes. At my house, part of the process when we don't have any gas in the car that my children drive, the process is a mom or dad go buy the gas. But that doesn't create a legal obligation. Mr. Fallon, in this case, I know there are lots of disputes about the nature and extent of the promise, but why isn't it appropriate to have the jury hear the facts and decide what promise Dow made and whether or not that promise was breached? I hear you saying, because of the various words that are in there, that I'm assuming you're saying that we never really had a meeting of the minds in order to create a contract because there's a missing essential element. Correct. But if we assume, if we reject that by assumption, then why wouldn't it be appropriate for the jury to make the call on what was the promise and was there, in fact, a breach? For two reasons, Your Honor. First, because the evidence that's been presented through deposition testimony is unequivocal. Ms. Gasson testified to exhaustion about all the conversations that occurred that she would now rely on as the basis of her alleged promise. And when we measure that evidence up against the legal standards in Michigan to establish any of these three claims, breach of contract, promissory estoppel, or fraud, they don't meet the standard. And that's absolutely unequivocal. The second key reason, and the second really overarching point that I want to leave with you, is it's undisputed factually and legally that she remained an at-will employee. And as your questions, Judge Gilman, and you asked this question of Ms. Rivers, how does all of this fit with the fact that she remained an at-will employee? When a person is an at-will employee, we do not litigate over the reasons why an employer may remove him or her from the position. We don't litigate over whether Ms. Rivers' perspective on Ms. Gasson's performance or Dow Corning's perspective on her performance is the correct one, because Dow Corning retained the undisputed right to remove her from that job for whatever reasons it deemed sufficient. And it's very important to note that her own expert witness, an immigration expert, testified to that effect. There's nothing about the green card process or a company's initiation of an attempt to get a person a green card that requires an employer to either continue that person's employment, much less to continue that person's employment in a position where there'd be sufficient managerial authority for that position to be green card eligible. In other words, to make her case, Ms. Gasson needs much more than a promise to sponsor her for a green card. She needs a promise that for the remainder of that green card process, as long as it may take, Dow Corning, we will leave you in a position. We won't terminate your employment. The position we leave you in will be of sufficient responsibility that meets the green card standards, and we won't even change that position because if we did, we'd have to start the green card process all over again. I would emphasize also, Your Honors, that in Michigan, the so-called covenant of good faith and fair dealing, which the plaintiffs alluded to once or twice, has been squarely held not to apply in the context of at-will employment. That's the Cockles v. International Business Expositions case we cited in the brief. There was a point at which Dow Corning decided to stop the green card process because they had made the managerial decision to send her back to Belgium. Correct. Now, they didn't tell her right away. How long was that gap between the time they stopped the green card process and when they informed her that she was going to not be continuing to stay in the U.S.? It was about two weeks. Dow Corning notified. The story is that this is the point when Ms. Gasson's subordinates were reporting to Human Resources that she's tyrannical, and there are problems with her communications and management style, and HR investigates and says there is substance to this. Can we keep this person in a management position given her characteristics? The judgment was that no, we can't. The conclusion from that was if she can't be in a management position, she's not going to qualify for a green card. So they instructed their immigration attorneys, who had been engaged in a lot of work on this process, to stop. Is this the Fragelman Law Firm? Correct. But they didn't tell Ms. Gasson yet because they needed to develop, I think in courtesy to her, some message to her about what was to come next. Now those are all simply factual assertions that get into the weeds again, but if we stand back again and contemplate that all this happened in the context of at-will employment, Dow Corning had the unqualified right to take those steps. The third point that I would want to leave the court with is that there was no drop-dead date by which a green card had to be obtained. This relates probably mostly to her contention about fraudulent concealment, but it's also important because it really refutes the whole theme of this case. The theme being Dow Corning bungled this green card process, realized that they were not going to be able to complete it in time for Ms. Gasson to get a green card, so then they contrived these reasons to remove her so they wouldn't be embarrassed by that. The premise of that whole argument is false, as her own expert testified. There is an arrangement by which a person on an L-1A visa can recapture time. The clock doesn't count against her L-1 visa unless and until she's actually working in this country. Well, she spent a great deal of her time traveling to other countries in this position. So, quite plainly, if she had gone to another country for a while, she could have obtained an indefinite amount of additional time on her L-1A, and the green card processing could have continued all along. Her expert also testified this is not an uncommon arrangement at all when you run into these kinds of considerations. So the whole idea that the green card was becoming impossible and therefore motivated some subversive strategy by Dow Corning is just categorically false. How long was the gap between the time Dow Corning agreed to localize her and when she was sent back to Belgium? The localization discussion began in December of 2011. She, on the books, took that position April 1 of 2013, although I think it's April 1 of 2012, but she did start performing earlier than that. She went back to Belgium April 1 of 2015, exactly three years, in terms of the time she held the job. What you referred to as the two weeks between deciding and telling her or doing something, is that between August 11 and August 27? Yes. August 27 is the email to the Fragman attorney. Yes. But when did she find out this was all? I believe the email to the Fragman attorney. Your Honor, I'm reluctant to make claims about dates. Her brief says it's August 27 of that email. I can't respond to the exact dates. I know there was an interval of time between the time the decision was made and Fragman was notified and then the time when the plaintiff was notified. Again, her brief says September 30, so that would make it a month or so. I can't address that, Your Honor. Obviously, in terms of our perspective on the case, I don't believe it's relevant. One last thing I want to point out. If Ms. Gasson, under these facts, has an enforceable contract or an enforceable promise under promissory estoppel, then, by definition, likewise does every other foreign national who comes to this country to work on a so-called permanent basis. Every foreign national is going to be able to say, it was necessary for me to take this job on a permanent basis that I get a green card. Every foreign national is going to be able to say, the company undertook to sponsor my green card and if this case provides a basis for a jury to consider the existence of a contractual obligation, to litigate the reasons for the removal from the position, to litigate the detailed circumstances of who did what when, in terms of processing this green card, then so does every other foreign national who comes here under these circumstances. That would represent a massive incursion into the at-will doctrine that, as all of you know, is well established in Michigan law and in the decisions of this court that have applied that law. Unless you have further questions, that concludes my remarks. Thank you. Thank you. Ms. Rivers, you have your remaining time for rebuttal. Just to address your question, Judge Boggs, about the timing. It was August 11th and then August 27th when they notified the firm and she was not notified for five weeks later until September. September 30th. And then the other fact about the performance was that she was so bad that they wanted to keep her around to train her successor, so they kept her until April of 2015. You know, Mr. Fallon makes a policy argument at the end about how this would affect all foreign nationals, but it doesn't affect all foreign nationals. It only affects foreign nationals who Dow Corning decides are good enough that they want them to stay here permanently and want to give them a permanent position. And when they make that localization, when they offer them the permanent residency, they also have an obligation to work to get the green card that will allow that to happen. And although there's a claim that Ms. Gasson testified unequivocally that there was no such promise, she in fact testified that she was promised a promotion with a green card and that she was told that she would be sponsored for a green card. The two relocation specialists both testified that it didn't have to be said. You didn't have to use the word green card. You didn't have to put it in the localization agreement because everybody who was involved in the situation knew that by offering the promotion with the permanent residency, you were offering to get the green card or to sponsor and take steps to get the application for the green card. Their argument is that we could say we're going to do it and then not take any steps to do it and that's okay. They did take steps. They hired the Fragment Law Firm. They did advertise eventually to see if any U.S. citizen could fill the position. They did take steps. They did. There's no doubt they took steps. I think they were very dilatory and caused the process to fail. I think there's no doubt about that either. Their own relocation specialist says the delay was caused by their failure to get the job description done. That's what she testified to in her deposition. I do think the burden is on them. Under Michigan law, it's true that you can't alter an at-will contract with a good faith and fair dealing covenant. However, the courts do say that there is a duty of good faith and fair dealing when one party controls the performance. I think that's what we have here. The application for the green card was completely within Dow Corning's control and their failure to act is what led her not to have that green card and not to be able to stay in the country. The failure of the job description is the key breach of the contract in your view? Yes, it's where everything went wrong. Ms. Ratizak testified to that in her deposition. She was an employee that they wanted to keep. This claim about the different terms that were used to describe the contract, they were descriptions. In my brief, I cited to the places where I said pursue a green card. The promise was understood by everybody. I don't think semantics of descriptive terms changed that. Thank you, counsel. The case will be submitted and the clerk may call the next case.